# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| JORGE RODRIGUES, | ) | CASE NO. 4:23-cv-2122 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| CITY OF CAMPBELL, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is the joint motion for summary judgment (Doc. No. 24 (Motion)) filed by defendants City of Campbell, Nicholas Phillips ("Phillips"), Pat Kelly ("Kelly"), and John Zomoida, Jr. ("Zomoida") (collectively "defendants"). Plaintiff Jorge Rodrigues ("Rodrigues") opposes the motion (Doc. No. 33 (Opposition)), and defendants filed a reply. (Doc. No. 36 (Reply).) For the reasons discussed herein, the motion for summary judgment is granted and the case is dismissed.

## I.    BACKGROUND

Phillips served as a police officer for the City of Campbell until 2004, and as the Mayor of the City of Campbell between 2015 and 2021. (Doc. No. 28-1 (October 2024 Deposition of Phillips and Exhibits), at 3 (7:14–20).)[1] The facts of this case revolve around a 2003 letter from Phillips's then-psychiatrist, Dr. Nalluri, sent in support of his application for disability benefits from the

---

[1] Page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system. Given that depositions appear on the docket with additional pagination, for ease of reference, a second number appearing in parentheses reflects the corresponding page and line number supplied by the court reporter.

police force. (*See* Doc. No. 29-1, at 120–21 (Dr. Nalluri's letter).) Sixteen years later, information from Dr. Nalluri's letter was posted on Facebook during Phillips's third mayoral election separately by two constituents, including Rodrigues. (Doc. No. 24, at 13–16 (citing depositions).) As a result of those Facebook posts, Rodrigues was arrested and prosecuted for receiving stolen property under Campbell Codified Ordinance Section 545.18.[2] (*See generally* Doc. No. 1-1.) Rodrigues filed this action, alleging his arrest and prosecution violated his constitutional rights and state law.

### A.  Dr. Nalluri's Letter

Dr. Nalluri's letter, dated July 21, 2003, explains that Phillips had been diagnosed with post-traumatic stress disorder and depression. (Doc. No. 29-1, at 120.) It includes additional, sensitive details about Phillips's mental health and concludes that "Phillips . . . is unable to function in any capacity as a law enforcement officer [and] . . . the prognosis is poor that he will recover sufficiently to return to active duty[.]"(*Id.* at 121.) After receiving Dr. Nalluri's letter, the Ohio Police and Fire Pension Fund granted Phillips's application for disability benefits. (Doc. No. 28-1, at 7 (24:18–25).) He left the Campbell police force shortly thereafter. (*Id.* at 7 (24:9–17).)

Philips won his first mayoral election in 2015, after a race that involved some political mudslinging. (*See id.* at 4 (11:11–18); *see also id.* at 11 (37:21–25) (Phillips describing his opponents engaging in "dirty politics").) Prior to beginning his mayoral term on December 1, 2015, Judith Clement ("Clement"), a City of Campbell employee who had apparently accessed the letter, threatened to publish it on social media. (Doc. No. 28-1 at 10 (36:19–23); *see id.* at 10 (35:19–36:3) (Phillips explaining he was aware of people seeking to release the letter to "disparage [him]

---

[2] Rodrigues incorrectly asserts that he was arrested pursuant to Ohio Rev. Code § 2913.51(A). (*See* Doc. No. 1-1, at 7.) Though Campbell Codified Ordinance Section 545.18 mirrors Ohio Revised Code Section 2913.51(A), the record reveals that Rodrigues was arrested pursuant to the Campbell Codified Ordinance. (*See, e.g.*, Doc. No. 29-1, at 261.)

as a candidate").) Concerned that the letter could be publicly released by Clement or someone else, Phillips hired an attorney to write a demand letter to Campbell's then-law director, Brian Macala ("Macala"). (*Id.* at 10–11 (36:24–37:11).) The letter threatened to sue the City of Campbell if any of its employees published the letter on social media. (*Id.*)

As soon as Phillips took office in December 2015, he went to look for his police personnel file at city hall, which is where he assumed Dr. Nalluri's letter was located.[3] (*See id.* at 9 (29:25–30:2); *id.* at 14 (52:7–14).) But Phillips could not find his file. (*Id.* at 9 (30:3–31:9).) He asked the police chief and law director if they knew where his file was, but they too could not find it. (*Id.* at 9 (31:17–23).)[4] Over the next few years, Phillips did not pursue the matter further. (*Id.* at 13 (46:22–48:24); *see also id.* at 13 (48:18–22) (Phillips explaining he did not immediately order an investigation into the missing file because he "had so much other stuff to do").)

### B.  Beatty and Rodrigues's Facebook Posts

Clement never published the letter on social media, but it nonetheless made its way onto Facebook during the 2019 election cycle, which again involved rhetorical "attack[s]" against Phillips's candidacy. (*See* Doc. No. 28-1, at 21 (79:19–25); *see also id.* at 15 (54:3–13) (Phillips describing a "hate page" where constituents would "name call[]" him during the election).) In April 2019, a former City of Campbell police officer, Russell Beatty, Jr. ("Beatty"), posted information from the letter in a Facebook group called "Red Devil Chatter."[5] (Doc. No. 25-2, at 167–74 (Beatty's Facebook comments).) Though the parties disagree about what Beatty posted relative to Dr. Nalluri's letter, the record only reveals a selection of Facebook comments made by

---

[3] Phillips had never actually seen Dr. Nalluri's letter in that file firsthand. (*Id.*)

[4] Because Dr. Nalluri's letter was presumably located inside the file that was reported missing, the Court refers to "the letter" and "the file" interchangeably.

[5] Red Devil Chatter was started by a former police officer who once worked with Phillips. (Doc. No. 28-1, at 19 (71:20–72:15).) Phillips described Red Devil Chatter as the "official hate page" for him at that time. (Doc. No. 28-1, at 15 (54:5–6).)

Beatty on April 22, 2019. (*Id.*) One comment reads: "The mayor is currently receiving 2 paychecks from the city, first for a mental disability and second for the mayors position. So being on a mental disability, maybe we should question his aggressive behavior??" (*Id.* at 171.) Phillips attests that the language Beatty used in those comments could only have come from Beatty reading Dr. Nalluri's letter. (*See* Doc. No. 28-1, at 15 (54:18–55:3) ("[T]here's no way Russ Beatty would have got that [information] just in the wind.").)

On April 26, 2019, Phillips filed a police report about the missing letter and Beatty's comments with then-City of Campbell Lieutenant Kevin Sferra ("Sferra"). Describing the incident, Sferra wrote:

> Phillips states that it was recently brought to his attention that Russell Beatty Jr. has been posting on social media about information that was contained in his personnel file that is unable to be located. Phillips states that this information has to do with medical records and other reports that he believes should not be public record. Phillips states that he believes that personnel files from former city employees, including those of him and his wife, have been illegally removed from city hall.

(Doc. No. 29-1, at 110–11 (police report).)

In addition to Beatty's Facebook comments, Rodrigues alleges Beatty also posted full scans of Dr. Nalluri's letter in Red Devil Chatter. (Doc. No. 33, at 16–17.) Defendants dispute this account and argue that they are unaware of Beatty ever posting scans. (Doc. No. 36, at 5–6.) The record contains no evidence that the full scans were ever posted from Beatty's Facebook account, nor is there record evidence that defendants ever knew about any such scans allegedly posted by Beatty.

Then-City of Campbell police officer Kelly, who took over Sferra's investigation of the file, tried to contact Beatty about his Facebook comments. (Doc. No. 29-1 (Deposition of Pat Kelly and Exhibits), at 16 (58:10–15).) But by that point, all of Beatty's Facebook activity was no longer available, and Beatty was never reached or investigated by Kelly. (*Id.* at 31–32 (120:21–122:15)

4

(Kelly explaining he searched for Beatty's comments the day Phillips filed the report but could not find them); *see also* (Doc. No. 25-2, at 5 (20:9–16) (Rodrigues explaining Beatty's post was "only up for like maybe a day").) Beatty was then "eliminate[d]" as a suspect, because there was, in Kelly's words, "nothing to prove he took the file." (Doc. No. 29-1, at 32 (124:3–10).)

About six months later, Rodrigues uploaded full scans of Dr. Nalluri's letter to Facebook in two posts. One post, which is undated, was published in Red Devil Chatter with the caption: "Have people seen this? I really think that the State Organization who granted Nick Phillips a deserved disability should determine if he is even allowed to be Mayor. If the Mayor is the boss of the police but, according to his disability, Ian [sic] allowed to interact with police then that seems like he shouldn't be allowed to be Mayor." (Doc. No. 29-1, at 250.) The other post, dated October 19, was published in another Facebook group called Elect Juanita Rich for Mayor, with the caption: "Uhmmmmm, who is the boss of the police? Something doesn't seem legal here…..just saying. No wonder things don't get fixed in Campbell." (*Id.* at 252.)

Phillips learned about Rodrigues's posts from Joe Mazzocca ("Mazzocca"), a Campbell city councilman, whom Rodrigues had privately messaged. (Doc. No. 28-1, at 29 (111:4–12).) After seeing Rodrigues's post in Red Devil Chatter, Mazzocca asked Rodrigues to forward him the scans of Dr. Nalluri's letter. (Doc. No. 33, at 6–7.) Rodrigues agreed. (*Id.* at 7.) Mazzocca subsequently forwarded the images to Phillips. (Doc. No. 28-1, at 29 (111:13–17).)

On October 21, 2019, Phillips notified Kelly about Rodrigues's posts. (*Id.* at 27 (103:16–104:6).) In his notes, Kelly wrote that he "was notified by [Phillips] that his personal medical forms [sic] that was contained in his missing or stolen personnel file was being posted on Facebook by a Jorge Rodrigues." (Doc. No. 29-1, at 258.)

### C.  Investigation, Arrest, Prosecution, and Voluntary Dismissal of Charge

Before proceeding with an investigation of Rodrigues, Kelly first contacted the Mahoning County Sheriff's Department to ask if they would take the case. (*Id.* at 10 (36:4–10).) Kelly was concerned that with his boss, Phillips, as the victim, the case would be too "close to home" and would create an appearance of impropriety. (*Id.* at 10–11 (36:11–19).) Mahoning County declined. (*Id.* at 11 (38:25–39:13).) Kelly testified that he probably also asked the Youngstown Police Department to take it (*id.* at 11 (40:7–9)), but they presumably declined as well. With no one else willing, Kelly proceeded with the case himself.

On October 23, 2019, Kelly conducted a witness interview with Mazzocca, who reported that he noticed Rodrigues "bashing" him and Phillips on Facebook about a neglected yard in Campbell. (*Id.* at 249.) Kelly also interviewed Rodrigues's brother, Nelson Rodrigues. (*Id.* at 259–60.) The parties dispute whether Kelly ever tried to call Rodrigues but agree that Kelly never reached him to discuss the posts. (*Compare* Doc. No. 25-1 (September 2022 Deposition of Jorge Rodrigues and Exhibits), at 6 (24:18–22) (Rodrigues explaining he is unaware of any efforts by Kelly to reach him by phone), *with* Doc. No. 29-1, at 258 (Kelly's notes stating he made multiple unsuccessful attempts to contact Rodrigues).)

On or around October 29, 2019, Kelly approached Zomoida, the special prosecutor assigned to the case, to secure a warrant for Rodrigues's arrest.[6] (Doc. No. 29-1, at 33–34 (128:23–130:7).) Kelly handed Zomoida his case file at Campbell Municipal Court. (*Id.* at 34 (132:14–18; *see* Doc. No. 36-1 (reproduction of Kelly's case file).) Zomoida looked through the file and, believing that there was probable cause (*see* Doc. No. 26-1, at 25 (96:14-16)), approved a charge

---

[6] Zomoida was appointed as a special prosecutor for Rodrigues's case after the City of Campbell's acting law director, Macala, who otherwise would have served as the prosecutor, recused himself. (Doc. No. 29-1, at 33 (128:14–15).) Macala had previously represented Rodrigues in a divorce. (*Id.* at 34 (130:14–18).)

against Rodrigues for receiving stolen property, a first-degree misdemeanor. (Doc. No. 29-1, at 34–35 (132:19–133:2).) Kelly, who similarly believed that there was probable cause to charge Rodrigues (*see id.* at 28 (107:5–9), then took a "half sheet" signed by Zomoida, approving the charge, to Sheri Levendis ("Levendis"), Clerk of Courts for Campbell Municipal Court. (*Id.* at 34–35 (132:19–133:2).) Levendis generated the warrant (*id.*), which was then signed by Kelly. (*Id.* at 28 (106:1–5).)

The warrant was supported by a one-sentence complaint including the elements of Campbell Codified Ordinance Section 545.18 and a description of the allegedly stolen property: "City of Campbell Personnel records of Nicholas Phillips." (Doc. No. 29-1, at 261.) No discussion relative to the probable cause determination occurred between Kelly and Zomoida. (*Id.* at 35 (128:23–25, 133:24–134:1) (Kelly explaining he "gave [Zomoida] the case file and he read it[,]" but did not ask any questions).)

Once the warrant was secured, Kelly called the U.S. Marshal Service to arrest Rodrigues at his Akron home on October 31, 2019. (*Id.* at 6 (20:11–20) (Kelly explaining he called the U.S. Marshal Service because Rodrigues's home was outside the Campbell police department's jurisdiction).) On October 31, 2019, Rodrigues was taken into custody. (Doc. No. 1-1 ¶ 16; Doc. No. 25-2, at 12 (46:2–4).) Rodrigues spent one night in jail. (Doc. No. 25-2, at 19 (73:15–74:19).) He was arraigned the next day, November 1, 2019. (Doc. No. 24-1 (certified copy of state court docket), at 3.) Rodrigues posted bond and a trial date was set for March 25, 2020 (*id.* at 2–3), which was continued multiple times due to COVID-19 restrictions. (Doc. No. 35 (2025 Deposition of John Zomoida), at 10 (33:10–12 (Zomoida explaining the pandemic delayed Rodrigues's proceedings).)

On March 6, 2020, Zomoida sent a letter to Phillips explaining his intention to voluntarily dismiss the case, which was, at that time, scheduled for trial on March 25, 2020. (Doc. No. 28-2, at 28–29.) The letter expressed Zomoida's belief that there was insufficient evidence to meet his burden of proof at trial. (*See id.*) "[I]t is my intention to voluntarily dismiss the case. . . . If I do not hear from you by [March 12, 2020], please be advised that I will proceed with filing a notice of voluntary dismissal on March 13, 2020[,]" Zomoida wrote. (*Id.*) Due to delays caused by the COVID-19 pandemic, however, the trial date was continually rescheduled over the next year until it was ultimately set for trial on July 21, 2021. (*See* Doc. No. 25-2, at 51–52 (Campbell Municipal Court docket revealing Rodrigues's trial was postponed on 3/19/2020 and 7/9/2020 due to COVID-19, and again on 9/23/2020 and 4/9/2021).) On June 15, 2021, Zomoida filed a motion to dismiss the case. (*Id.* at 51 (docket entry indicating Zomoida emailed a motion to dismiss on 6/15/2021); *see* Doc. No. 28-2, at 33 (motion to dismiss).) The case was dismissed on June 18, 2021. (Doc. No. 25-2, at 51.)

On September 26, 2023, Rodrigues sued Zomoida, Phillips, Kelly, the City of Campbell, and John Does 1–6 in the Mahoning County Court of Common Pleas.[7] (Doc. No. 1-1.) The action was removed to this Court on the basis of federal question jurisdiction. (Doc. No. 1 (Notice of Removal).)

## II.    STANDARD OF REVIEW

When a party moves for summary judgment, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[7] Rodrigues previously brought a similar action against the same defendants in November 2021. *See Rodrigues v. City of Campbell*, No. 4:21-cv-226 (N.D. Ohio 2022) (Doc. No. 1). There, defendants moved for partial judgment on the pleadings as to Zomoida's prosecutorial immunity. Rodrigues did not file an opposition, and the Court granted the motion. *See id.* (Doc. No. 15). The Court subsequently entered a stipulated order of dismissal without prejudice pursuant to Fed. R. Civ. P. 41(a). *Id.* (Doc. No. 18).

matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, the district court views the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A factual dispute is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991) (citation omitted). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (noting that summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish an essential element of that party's case and on which that party will bear the burden of

proof at trial). Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and cannot defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; "[a] mere scintilla of evidence is insufficient[.]" *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

## III. DISCUSSION

Rodrigues sets forth twelve causes of action: (1) false arrest under federal law (Doc. No. 1-1 ¶¶ 27–30); (2) false arrest under Ohio law (*id.* ¶¶ 31–34); (3) malicious prosecution (*id.* ¶¶ 35–38); (4) a *Monell* claim (*id.* ¶¶ 39–46); (5) civil conspiracy (*id.* ¶¶ 47–50); (6) failure to intervene (*id.* ¶¶ 51–56); (7) willful, wanton, reckless, grossly negligent, malicious, and bad faith conduct (the "negligence" claim) (*id.* ¶¶ 57–59); (8) abuse of process (*id.* ¶¶ 60–62); (9) First Amendment retaliation (*id.* ¶¶ 63–65); (10) inadequate hiring, training, retention, discipline and/or supervision (the "supervisor liability" claim) (*id.* ¶¶ 66–70); (11) violation of Ohio's public records law (*id.* ¶¶ 71–74); and (12) slander/defamation/libel (the "defamation" claim) (*id.* ¶¶ 75–79).

Defendants move for summary judgment on all twelve claims. (*See* Doc. No. 24, at 20–39.) They argue Rodrigues's claims against Zomoida are barred by absolute prosecutorial immunity (*id.* at 20–22), and his claims against Kelly and Phillips are barred by qualified immunity. (*Id.* at 22–23.) In the alternative, defendants argue that summary judgment is proper on

10

Rodrigues's Section 1983 claims because the investigation, arrest, and prosecution of Rodrigues were supported by probable cause and a warrant. (*Id.* at 27–33.) On Rodrigues's state-law claims, defendants likewise argue they are entitled to employee immunity under Ohio Rev. Code §2744.03(A)(6), and that, in any event, they are entitled to summary judgment because Rodrigues cannot satisfy the *prima facie* elements of any of his claims. (*Id.* at 33–39.) And on Rodrigues's *Monell* claim, defendants argue, *inter alia*, that Rodrigues failed to identify a policy or custom that led to the alleged violations of his rights. (*Id.* at 10.)

Rodrigues argues that Phillips and Kelly are not entitled to immunity, and that material issues of fact preclude summary judgment on his false arrest, malicious prosecution, retaliation, conspiracy, and failure to intervene claims. (Doc. No. 33, at 24–33.) He broadly contends that state law immunity does not apply. (*Id.* at 36.)

Rodrigues did not specifically oppose defendants' arguments for summary judgment on three of his claims: abuse of process (Count 8), violation of public records law (Count 11), and defamation (Count 12). (*See generally id.*) Nor did he oppose defendants' argument that Zomoida is entitled to absolute immunity. (*See id.*) But the Court may not grant summary judgment on that fact alone and must instead "review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists." *Fed. Trade Comm'n v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014).

### A.  Prosecutorial Immunity

Rodrigues directs nine of his claims against the special prosecutor, Zomoida—false arrest under federal and state law (Counts 1 and 2), malicious prosecution (Count 3), civil conspiracy (Count 5), failure to intervene (Count 6), negligence (Count 7), abuse of process (Count 8), First Amendment retaliation (Count 9), and defamation (Count 12)—largely for his role in initiating,

pursuing, and ultimately dropping the charge for receiving stolen property. (Doc. No. 1-1 ¶¶ 27–38, 47–65, 75–79.)

"State prosecutors are absolutely immune from civil liability when acting within the scope of their prosecutorial duties." *Howell v. Sanders*, 668 F.3d 344, 349 (6th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409, 420, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976) (additional citations omitted)). The "analytical key to prosecutorial immunity, therefore, is advocacy—whether the actions in question are those of an advocate." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (citation omitted).

The record demonstrates that Zomoida reviewed Kelly's case file and signed a "half sheet" approving the charge against Rodrigues. (Doc. No. 26-1 (2024 Deposition of John Zomoida and Exhibits), at 5 (16:10–21) (Zomoida explaining he reviewed the police reports and told Kelly he was "good with filing the charge"); *see also* Doc. No. 29-1, at 34–35 (132:14–133:13) (Kelly explaining Zomoida signed a "half sheet" approving the charge).) He was also responsible for Rodrigues's prosecution in municipal court between October 2019 and June 2021, and for dropping the charge in June 2021. (Doc. No. 26-1, at 31 (117:22–118:13) (Zomoida explaining he decided to drop the charge when he learned that "a lot of people actually had" Dr. Nalluri's letter).) These actions are all "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430; *see Kalina v. Fletcher*, 522 U.S. 118, 129, 118 S. Ct. 502, 139 L. Ed. 2d 471 (1997) (finding prosecutor's preparation and filing of charging documents, including information and motion for arrest warrant, were protected by absolute immunity); *Theriot v. Wayne Cnty. Prosecutor*, No. 11-13158, 2011 WL 3320511, at *2 (E.D. Mich. Aug. 2, 2011) (finding "a prosecutor is absolutely immune from civil suit based on a decision not to prosecute or to terminate a prosecution." (citations omitted)). Accordingly, Zomoida is immune from all claims arising out

12

of his role in initiating and pursuing Rodrigues's prosecution: false arrest (Counts 1 and 2), malicious prosecution (Count 3), failure to intervene (Count 6), negligence (Count 7) and First Amendment retaliation (Count 9).[8] Defendants are entitled to summary judgment on these claims with respect to Zomoida.

Rodrigues's other claims against Zomoida include allegations that arguably fall outside the contours of his role as an advocate. (*See, e.g.*, Doc. No. 1-1 ¶ 61 (Rodrigues's abuse of process claim alleging Zomoida sought to impede Rodrigues's ability to pursue a civil rights lawsuit); *see also id.* ¶ 76 (Rodrigues's defamation claim alleging Zomoida made false statements of fact to the media).) The Court thus addresses each of these claims separately in Section III.D. *See Price v. Montgomery Cnty., Kentucky,* 72 F.4th 711, 720 (6th Cir. 2023) (finding prosecutor was immune only for conduct "in furtherance of genuine prosecutorial interests" (citation omitted)).

### B. Qualified Immunity and Statutory Immunity

Defendants argue, at a high level, that Phillips and Kelly are entitled to immunity against Rodrigues's Section 1983 claims, but do not identify the claims to which their immunity defense is directed or address any elements of any claims. (Doc. No. 24, at 22–23.) Their entire argument about Phillips's and Kelly's conduct in the context of qualified immunity states:

> Here, the plaintiff cannot show that there was "robust consensus" that it was unlawful for Mr. Phillips to report his personnel file as stolen and then report when pictures of the stolen records were posted online. Similarly, as to Chief Kelly, he received a complaint that stolen records had been posted online and conducted an investigation. Thereafter, he provided his investigation to Prosecutor Zomoida, who determined probable cause existed and the charges were valid. Again, there is nothing objectively unreasonable about this conduct.

(*Id.* at 22.)

---

[8] Because "the Ohio rules governing prosecutorial immunity mirror the federal rules[,]" *Beckett v. Ford*, 384 F. App'x 435, 452 (6th Cir. 2010), the Court need not conduct an additional, state law analysis of Zomoida's immunity defense. Rodrigues's claims against Zomoida under federal and state law are both properly dismissed.

Defendants have not adequately put forth the qualified immunity defense. *See, e.g.*, *Reynolds v. Smith*, No. 2:11-cv-277, 2017 WL 4310508, at \*8–9 (S.D. Ohio Sept. 28, 2017) (declining to consider defendant's qualified immunity argument because it did not identify the claim to which the immunity defense was directed and the argument was not raised within the framework of a qualified immunity analysis); *McClure v. Johnson*, No. 1:15-cv-35, 2019 WL 13444614, at \*12 (M.D. Tenn. July 24, 2019) (limiting qualified immunity analysis to the claims and officer defendants specifically mentioned in a motion for summary judgment), *report and recommendation adopted*, 2019 WL 13444613 (M.D. Tenn. Aug. 13, 2019)*;see also Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31, 36–37 (1st Cir. 2007) (finding district court did not abuse its discretion in concluding that defendants had waived their qualified immunity defense to plaintiff's First Amendment claims where the defendants had provided three sentences of argument "broadly" raising the defense and "the qualified immunity section of their summary judgment motion never even mentioned the words 'First Amendment[.]'"). "It is insufficient for defendants to cite law for the general proposition that qualified immunity exists and then conclusorily assert that they are entitled to it." *Stewart v. Gracik*, No. 1:10-cv-698, 2011 WL 4559179, at \*14 (W.D. Mich. Aug. 26, 2011).

The same applies to defendants' state immunity defense, which also does not specifically address any of Rodrigues's claims or any facts of the case. (*See* Doc. No. 24, at 34–35 ("To the extent the state law claims are asserted against defendants . . . these defendants are similarly entitled to employee immunity").) Instead, they perfunctorily assert that "the record demonstrates the defendants were all acting with the scope of their employment and within their official responsibilities." (*Id.* at 35.) "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to

mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citations and quotation marks omitted); *see Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (a court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments).

Accordingly, the Court declines to address the federal and state immunity defenses as to Phillips and Kelly. Even so, defendants' failure to adequately assert a qualified immunity defense is inconsequential because, as the Court will discuss, Rodrigues has failed to produce evidence to support any of his claims against Phillips and Kelly. The Court next proceeds with an analysis of each defendant's conduct in securing the warrant, concluding both Phillips and Kelly are entitled to summary judgment on the merits of Counts 1 and 2 (false arrest), Count 3 (malicious prosecution), and Count 9 (First Amendment retaliation) in part because there was probable cause for Rodrigues's arrest, thereby defeating an essential element of each of these claims. Rodrigues's remaining claims against Phillips and Kelly are addressed separately.

### C.  Rodrigues's First and Fourth Amendment Claims

Rodrigues asserts four First and Fourth Amendment claims: false arrest (Counts 1 and 2), malicious prosecution (Count 3), and First Amendment retaliation (Count 9). (Doc. No. 1-1 ¶¶ 27–38, 63–65.) Though Rodrigues's posts were undoubtedly First-Amendment protected expression,[9]

---

[9] "As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527, 121 S. Ct. 1753, 149 L. Ed. 2d 787 (2001) (citing *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102, 99 S. Ct. 2667, 61 L. Ed. 2d 399 (1979)). The First Amendment protects the disclosure of truthful information on matters of public concern—like a mayoral candidate's fitness for office—even if that information was obtained unlawfully by a third party. *Bartnicki*, 532 U.S. at 534–35. Further, by sharing publicly his conviction that Phillips holding mayoral office—and potentially double dipping in the state's coffers by receiving both a disability pension and a mayoral salary—"was really wrong" (Doc. No. 25-2 (October 2024 Deposition of Jorge Rodrigues and Exhibits), at 8 (29:8–31:6)), Rodrigues engaged in political speech during an election cycle. This type of expression receives "the core of First Amendment protections." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016).

all of these claims rise and fall on whether there was probable cause for Rodrigues's arrest. *See Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 675, 677 (6th Cir. 2005) (finding that claims for false arrest and malicious prosecution fail if there was probable cause for the arrest); *see also Nieves v. Bartlett*, 587 U.S. 391, 402, 406–407, 139 S. Ct. 1715, 204 L. Ed. 2d 1 (2019) (holding that probable cause defeats a First Amendment retaliation claim unless plaintiff presents "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.").

> i. *Phillips's Conduct*

Rodrigues has offered no evidence that Phillips violated his First or Fourth Amendment rights. *Copeland v. Machuli*s, 57 F.3d 476, 481 (6th Cir. 1995) (affirming summary judgment where the plaintiff failed to demonstrate that the defendant was "personally involved" in the alleged constitutional violations). The undisputed record reveals that Phillips was not involved in determining probable cause or securing the arrest warrant, that he did not "ask anyone to sign a warrant or press charges" against Rodrigues (Doc. No. 28-1, at 24 (89:17–24)), that he did not "suggest to anyone" that Rodrigues should be arrested or prosecuted (*id.* at 24 (90:15–17)), and that he did not have "any input relative to the charges, arrest, or prosecution" of Rodrigues. (*Id.* at 37 (141:15–18).) As best the Court can discern, the extent of Phillips's involvement is filing a police report with Sferra[10] indicating his belief that his personnel records had been stolen (Doc. No. 29-1, at 110–11), announcing his personnel file was missing at a staff meeting with Kelly (*id.* at 12–13 (44:25–45:10)), and discussing the case with Zomoida. (Doc. No. 28-2 (December 2024 Deposition of Nicholas Phillips and Exhibits), at 8 (27:10–28:13) (Phillips explaining Zomoida

---

[10] The propriety of Phillips filing a police report, as the victim, with his own city's police department, is a separate question that is not before the Court. (*See* Doc. No. 29-1, at 10 (36:11–19) (Kelly explaining he was concerned about the appearance of impropriety in taking Phillips's case, since Philips was both his boss and the victim, and thus tried to get another police department to take it).)

asked him questions about himself, his medical records "and then that was about the end of it").)

Drawing all reasonable inferences in the light most favorable to Rodrigues, none of these facts demonstrate Phillips's involvement in any action that allegedly violated Rodrigues's asserted First or Fourth Amendment rights. *See Hilliard v. Sullivan Cnty. Sheriff's Off.,* No. 22-cv-219, 2020 WL 6322382, at *2 (E.D. Tenn. Oct. 28, 2020) (dismissing Section 1983 claim because "Plaintiff d[id] not set forth any facts from which the Court can plausibly infer that Defendants . . . were personally involved in any violation of his constitutional rights, as required to state a claim against them for violation of § 1983.").

But even if Rodrigues pointed to evidence that Phillips had been personally involved, summary judgment on these claims would still be proper because, as the Court will next discuss, there was probable cause to believe Rodrigues received stolen property based on the facts and circumstances known at the time. Thus, Phillips is entitled to summary judgment on Rodrigues's false arrest, malicious prosecution, and First Amendment retaliation claims.

### ii. *Kelly's Conduct*

Though Rodrigues does not dispute his arrest was made pursuant to a warrant, he argues Kelly did not truly have probable cause for his arrest. (Doc. No. 33, at 32–33.) He also alleges Kelly failed to disclose exculpatory facts to Zomoida when securing his signature for the charge. (*Id.* at 23.) "Probable cause exists if 'the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched[.]'" *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)). Probable cause requires only the probability of criminal activity—it does not require officers to possess evidence sufficient to prove every element of an offense. *See Adams v. Williams*, 407 U.S. 143, 149, 92 S.

17

Ct. 1921, 32 L. Ed. 2d 612 (1972). Even so, the officer must examine "the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence" before making a determination. *Gardenhire*, 205 F.3d at 318 (emphasis omitted).

Rodrigues was arrested for receiving stolen property under Campbell Codified Ordinance Section 545.18(a), which provides that "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Though Kelly had a warrant, Rodrigues argues that he lacked probable cause because there was no evidence that (1) Rodrigues received Dr. Nalluri's letter (the "receive element") (Doc. No. 33, at 26), (2) Rodrigues knew that the letter had been stolen (the "knowledge element") (*id.* at 4, 17, 27), or (3) Phillips's personnel file was stolen in the first place. (*Id.* at 11–12, 25.)

None of those arguments are availing. First, regarding the receive element, Rodrigues argues that defendants knew Beatty posted scans of Dr. Nalluri's letter in Red Devil Chatter before he did. (*See* Doc. No. 33, at 5.) In his complaint, Rodrigues alleges that fact should have dispelled probable cause that Rodrigues ever had physical possession of the file. (*See* Doc. No. 1-1 ¶ 20 (Rodrigues averring he was arrested by defendants despite their knowledge that the report "had been previously published on the internet thereby rendering it accessible to every person, globally").) Indeed, considering the ubiquity of digital file sharing on social media, Rodrigues avers Kelly should have known that Rodrigues more than likely screenshotted Beatty's content and did not physically receive the stolen file. (*Id.*; *see also id.* ¶ 21.)

The circumstances *alleged* by Rodrigues—that Kelly was aware that another user previously posted the same scans of the letter in the same Facebook group—might require a

different analysis for whether probable cause existed.[11] But discovery has concluded, and as defendants note (Doc. No. 36, at 5–6), Rodrigues has not introduced any evidence to establish a genuine issue of material fact as to whether Kelly was aware of another user posting pictures of the letter before Rodrigues. Instead, the record reveals defendants were only aware of Facebook *comments* by Beatty, which included manually entered information from the letter—not pictures of the letter that Rodrigues could have screenshotted for his own posts. (*See* Doc. No. 29-1, at 110–11 (Sferra's police report stating Beatty had been posting *information* contained in Dr. Nalluri's letter); *id.* at 31 (120:11–25) (Kelly explaining he never found any of Beatty's posts online));[12] *see also* Doc. No. 28-1, at 26 (99:25–100:14) (Phillips explaining Rodrigues was the only "one that ever posted [his] medical reports" and that he never heard of Rodrigues taking screenshots of another user's post).

Rodrigues has failed to support his contention that Beatty previously posted scans of the letter. At summary judgment, courts "need not give credence to mere allegations, or draw inferences where they are . . . not supported by specific facts." *Galey v. May Dep't Stores Co.*, 9 F. App'x 295, 298 (6th Cir. 2001) (citation and quotation marks omitted). Thus, without evidence to back up his allegation that Kelly was aware of a previous post that included scans of the letter, the Court need not consider whether a reasonable officer in Kelly's position could consider a screenshot of another user's publicly available Facebook posts "possession" under Section 2913.51(A), an issue Rodrigues focused on in his opposition. (*See, e.g.*, Doc. No. 33, at 3, 26–27.)

---

[11] At his deposition, Kelly appeared to acknowledge that this theory might require a different legal analysis: "[Counsel:] Okay. If Mr. Rodrigues took a screenshot of Dr. Nalluri's report from somebody else's Facebook page, would that constitute receiving stolen property?  [Kelly:] I don't really know if that would or not, to be honest with you. Because I really don't know how that works to take a screenshot. I mean, I would think it would look a little different than—I don't know. I honestly don't know." (Doc. No. 29-1, at 30 (113:4–11).)

[12] Rodrigues does not dispute Kelly's account that Beatty took down all posts relating to Dr. Nalluri's letter shortly after publication. (Doc. No. 25-2, at 5 (20:9–16) (Rodrigues explaining Beatty's post was "only up for like maybe a day").)

*See State v. Evans,* No. 108648, 2020 WL 4544753, at *15 (Ohio Ct. App. Aug. 6, 2020) (explaining that "possession" of stolen property under Ohio law may be constructive possession or actual possession).

On Rodrigues's second contention regarding the knowledge element, the Sixth Circuit has held that intent can be established by circumstantial evidence and inferences therefrom. *United States v. Goodwin*, 748 F. App'x 651, 655 (6th Cir. 2018). "And in the context of probable cause, a reasonable officer is permitted to make inferences as to intent." *See Novak v. City of Parma,* No. 1:17-cv-2148, 2021 WL 720458, at *10 (citing *United States v. Tagg*, 886 F.3d 579, 589 (6th Cir. 2018)). Defendants argue that four facts reveal they had a reasonable basis to believe Rodrigues received stolen property. (Doc. No. 24, at 29–30.) First, Dr. Nalluri's letter contains sensitive information about Phillips's psychiatric diagnoses—the type of information that is typically protected by statute or by doctor-patient privilege in the United States. (*See generally* Doc. No. 29-1, at 120–21.) Rodrigues acknowledges this in his opposition: he asserts that the letter is "embarrassing" for Phillips and appears to lament that there "was no interest at all in finding the potential thieves" of the file, "which contained very private information." (Doc. No. 33, at 6.) Second, the letter was addressed to the Ohio Police and Fire Pension Fund, and nothing on the face of the letter (or from any other context entered into the record) suggests that access had been authorized to anyone beyond the named recipient. (Doc. No. 29-1, at 120–21.) Third, Kelly knew that Phillips did not voluntarily release the letter. In fact, Phillips filed a police report when he learned the file was absent, reporting a potential theft crime. (*Id.* at 110–11.) Finally, Rodrigues deliberately shared the letter as part of a political Facebook post implying Phillips was unfit for office. (*Id.* at 250.) Though no doubt First Amendment-protected expression, the post's critical caption demonstrates that Rodrigues understood the sensitive, private nature of the material. On

these facts, Kelly was permitted to infer that Rodrigues knew or had reasonable cause to know Dr. Nalluri's letter was stolen. *See Novak*, 2021 WL 720458, at *10 (finding officers were permitted to infer the "knowingly" element of an Ohio statute based on plaintiff's deliberate actions).

Rodrigues's third contention that Kelly lacked probable cause to believe the record was stolen in the first place is unavailing. (Doc. No. 33, at 25.) "Officers do not have a duty to investigate a suspect's innocent explanation for possession of stolen property if the underlying facts"—here, that a letter containing sensitive medical information from Phillips's missing file was posted on Facebook by Rodrigues—"supply probable cause." *Miller v. City of Hillview*, No. 3:21-cv-575, 2023 WL 121993, at *5 (W.D. Ky. Jan. 6, 2023). Police officers are entitled to rely on a report that property was stolen to support probable cause that the property was, in fact, stolen. *Rodriguez v. City of Cleveland*, 439 F. App'x 433 (6th Cir. 2011)[13]; *see United States v. Carter*, No. 1:20-cr-62, 2021 WL 2592561, at *5 (S.D. Ohio June 24, 2021) (citing *Rohde v. City of Roseburg*, 137 F.3d 1142, 1144 (9th Cir. 1998) ("If an officer has reliable information, such as a police report, indicating that the vehicle has been stolen, he thus has probable cause to believe that the driver has committed the crime of either stealing the car or knowingly operating a stolen vehicle.")).

Rodrigues also appears to argue that probable cause for his arrest was categorically lacking because the charge was based solely on his First Amendment-protected expression. (Doc. No. 33, at 29–30.) It is true that Sixth Circuit caselaw has held that protected expression, alone, "cannot

---

[13] In *Rodriguez,* the Sixth Circuit found that the officers' observation—prompted by an informant's tip—that a suspect's tow truck had a stolen engine was sufficient to support probable cause that Rodriguez had knowingly received stolen property. *Id.* at 452–53. The Court acknowledges that Rodrigues's case differs from *Rodriguez* in that Kelly observed *digital images* of the property that the suspect, Rodrigues, posted online. But that is a distinction without a difference. About six months after the file was reported stolen, Rodrigues posted the only images Kelly (and other defendants) had ever seen of the letter online. On these facts, Kelly was not unreasonable to infer that Rodrigues "had something in his possession that didn't belong to him[.]" (Doc. No. 29-1, at 28 (107:17–28).) Rodrigues has offered no caselaw suggesting otherwise.

support a conviction and it cannot create probable cause." *Leonard v. Robinson*, 477 F.3d 347, 360 (6th Cir. 2007) (citing *Bachellar v. Maryland*, 397 U.S. 564, 570, 90 S. Ct. 1312, 25 L. Ed. 2d 570 (1970)); *see also Novak v. City of Parma*, 33 F.4th 296, 304–05 (6th Cir. 2022) (finding probable cause based exclusively on plaintiff's online speech was valid because *not all* of plaintiff's Facebook activity was clearly First Amendment-protected expression). But the Sixth Circuit recently clarified that this rule only applies in cases where there is no valid crime that the protected expression could raise a suspicion of. *Brown v. City of Albion, Michigan*, 136 F.4th 331, 343 (6th Cir. 2025) (reasoning that, because there is no valid crime that profane or vulgar speech could raise suspicion of, such speech "[can]not form the basis of a probable cause determination."). And Rodrigues's First Amendment-protected expression, itself, was not the "basis for a violation[.]*" Sandul v. Larion,* 119 F.3d 1250, 1256 (6th Cir. 1997). Instead, his Facebook posts "raise[d] a suspicion of" an indisputably valid crime: receiving stolen property. *See Brown,* 136 F.4th at 343 ("Where a particular type of conduct is criminalized, and constitutionally so, observation of that conduct, even if through speech, may form the basis of probable cause." (citing *Reichle*, 566 U.S. at 668)).[14]

---

[14] Rodrigues's other arguments about Kelly's conduct in securing the warrant are also unavailing. Rodrigues asserts that Kelly made a material omission of fact in failing to disclose that there was no evidence indicating the personnel file was stolen. (Doc. No. 33, at 23; *see also* Doc. No. 26-1, at 20 (74:3–17) (Zomoida testifying that he only learned there were no facts specifically indicating the report was stolen, rather than missing, after he approved the charge).) But Kelly's notes from October 21, 2019, which were in the file he presented to Zomoida (*see* Doc. No. 36-1), included an entry stating that Phillips's "personal medical forms [sic] that was contained in his *missing or stolen* personnel file was being posted on Facebook by a Jorge Rodrigues." (Doc. No. 29-1, at 258 (emphasis added).) Even if Kelly had failed to communicate to Zomoida that the file was potentially missing, probable cause still existed because the file's unexplained absence, coupled with the appearance of Dr. Nalluri's letter on social media, supported an inference that receipt of stolen property had probably occurred. *See Adams*, 407 U.S. at 149 (finding that probable cause requires the *probability* of criminal activity, not evidence sufficient to prove every element of an offense). Thus, the possibility that the file may have been merely missing was not "material" to finding probable cause. *Sykes*, 625 F.3d at 305. The same applies to Rodrigues's assertion that Kelly did not conduct a sufficient investigation because he did not confirm that *copies* of Dr. Nalluri's letter were not being circulated. (Doc. No. 33, at 13–15.) Had Kelly taken these additional investigatory steps, Rodrigues asserts, probable cause would have evaporated. (*Id.*) "'Perhaps as a matter of good detective work [Kelly] should have done these things. But [o]nce probable cause is established, an officer is under no duty to investigate further[.]'" *Tomasik v. Martin*, No. 22-1081, 2023 WL 2137354, at *6–7 (6th Cir. Feb. 21, 2023) (quoting *Lester v. Roberts*, 986 F.3d 599, 612 (6th Cir. 2021) (additional citation and quotation marks omitted)). And, as the Court has explained, Kelly acted reasonably in concluding that probable cause existed based on the facts known

In sum, "[p]robable cause [for arrest] . . . is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 188 L. Ed. 2d 46 (2014) (citations and quotation marks omitted). It "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction[.]" *United States v. Baker*, 976 F.3d 636, 648 (6th Cir. 2020) (citation and quotation marks omitted). Considering all the facts and circumstances known by Kelly at the time of arrest—that Phillips's personnel file had been reported stolen and could not be located, that Dr. Nalluri's letter was supposed to be located in the personnel file, and that pictures of the missing letter had suddenly appeared on Facebook as part of a political criticism of Phillips—probable cause existed to arrest Rodrigues under Section 545.18.[15] *Peffer*, 880 F.3d at 263. Thus, summary judgment is proper on Counts 1 and 2 (false arrest), Count 3 (malicious prosecution), and Count 9 (First Amendment retaliation) against Phillips and Kelly. *See Voyticky*, 412 F.3d at 677 (6th Cir. 2005) (finding that claims for false arrest and malicious prosecution fail if there was probable cause for the arrest); *see also Nieves*, 587 U.S. at 407 (holding that probable cause defeats a First Amendment retaliation claim unless plaintiff presents "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been").

### D.  Rodrigues's Remaining Claims

Rodrigues's remaining federal and state claims are directed at the individual defendants

---

at the time.

[15] The fact that Kelly received approval from prosecutor Zomoida further suggests that he had probable cause for Rodrigues's arrest. "Consultation with [an attorney] is a factor to be considered in evaluating whether an officer acted reasonably." *Halasah v. City of Kirtland*, No. 1:1-cv-166, 2013 WL 2200360, at *16 (N.D. Ohio May 20, 2013); *see also Messerschmidt v. Millender*, 565 U.S. 535, 553, 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012) (holding that "the fact that the officers sought and obtained approval of the warrant from [] a deputy district attorney before submitting it to the Magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause").

(Zomoida, Phillips, Kelly, John Does 1–6),the City of Campbell or some combination thereof. The Court addresses each claim in turn.

> **i.** Monell *Claim (Count 4)*

To state a *prima facie* Section 1983 claim against the City of Campbell (*see* Doc. No. 1-1 ¶¶ 39–46), Rodrigues must show that a violation of his federal rights occurred because of a municipal policy or custom. *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Here, Rodrigues has failed to demonstrate a First Amendment violation occurred because "the Supreme Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." *Novak*, 2021 WL 720458, at *14 (citing *Reichle,* 566 U.S. at 664–65). And because probable cause existed, Rodrigues has also failed to demonstrate he suffered a Fourth Amendment violation. *Id.* As explained below, those shortcomings doom his other federal claims as well. Without an underlying constitutional violation, the City of Campbell is entitled to summary judgment on the *Monell* claim. *See, e.g.*, *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").

> **ii.** *Civil Conspiracy (Count 5)*

As with the *Monell* claim, to state a *prima facie* claim for civil conspiracy under Section 1983, Rodrigues must show a constitutional violation. *Bartlett v. Washington*, 793 F. App'x 403, 408 (6th Cir. 2019) ("[I]f there is no underlying constitutional violation, there can be no claim for conspiracy either."). Because Rodrigues has not demonstrated that his constitutional rights were violated by the named defendants, as discussed above, he has not met his burden.

Additionally, though it goes beyond the parties' arguments, the Court notes that the Sixth Circuit has held that "members of the same legal entity cannot conspire with each other if their

acts were within the scope of their employment." *See Jackson v. Cleveland,* 925 F.3d 793, 818 (6th Cir. 2019). Discovery has concluded and Rodrigues has not identified any of the John Doe defendants, who might work for a separate legal entity. (Doc. No. 1-1 ¶¶ 6, 16.) With all claims against the Doe defendants dismissed, as discussed below, the intracorporate conspiracy doctrine applies and summary judgment would be appropriate for this additional reason. *Jackson,* 926 F.3d at 818.

### iii.    Failure to Intervene (Count 6)

To survive summary judgment on this claim against Zomoida and Kelly, Rodrigues must offer evidence "that the officers '(1) observed or had reason to know that [the constitutional harm was occurring], and (2) had both the opportunity and the means to prevent the harm from occurring.'" *Holloran v. Duncan,* 92 F. Supp. 3d 774, 793 (W.D. Tenn. 2015) (quoting *Sheffey v. City of Covington*, 564 Fed. App'x 783, 793 (6th Cir. 2014)). But as explained above, Rodrigues has failed to enter facts into the record that reveal he suffered a constitutional injury. Kelley and Phillips could not have intervened to prevent a harm that did not occur. *Id.* Summary judgment is thus proper on this claim.

### iv.    Negligence (Count 7)

In this state-law negligence claim against all defendants, Rodrigues avers that "[a]s a direct and proximate result of Defendants' willful, wanton, reckless, grossly negligent, and/or malicious conduct which was also conducted in bad faith, [he] suffered a violation of his rights, damages, and other losses." (Doc. No. 1-1 ¶ 59.) This claim, which Rodrigues did not address in his opposition, fails because the record does not reveal that defendants breached any duty to Rodrigues—nor that defendants' conduct was malicious. *Ratcliff v. Courtney Duff Const. Co*., No. CA96-7-134, 1997 WL 18291, at *2 (Ohio Ct. App. Jan. 21, 1997) ("In order to support a

negligence claim, a plaintiff must present evidence that the defendant was negligent and that such negligence caused the plaintiff's injury."). Nor is there any genuine issue of material fact on this claim. Summary judgment is proper.

> *v.    Abuse of Process (Count 8)*

Rodrigues avers that, "[b]y intentionally perverting the criminal proceedings and prosecution[,]" all defendants sought to intimidate him from publishing other criticism of Phillips, to impede his ability to pursue a civil rights lawsuit, and to cover up the truth about Phillips's mental health, among other things. (Doc. 1-1. ¶ 61.) In his opposition brief, however, he does not oppose defendant's arguments for summary judgment on this claim. (*See generally* Doc. No. 33.) Under Ohio law, the elements of abuse of process are: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Voyticky*, 412 F.3d at 677 (quoting *Yaklevich v. Kemp, Schaeffer, & Rowe Co. et al.*, 626 N.E.2d 115, 116 (Ohio 1994)).

"While no party disputes that [Rodrigues] was subjected to a legal proceeding, [he] has proffered no evidence . . . that the proceeding was perverted for the achievement of an ulterior purpose." *Id.* (internal citation and quotations omitted). Though Phillips was interested in stopping dissemination of Dr. Nalluri's letter (*see, e.g.*, Doc. No. 28-1, at 10–11 (36:24–37:11) (Phillips explaining he hired an attorney to threaten Macala with a lawsuit in 2015 if a Campbell employee leaked the letter)), nothing in the record reveals that Phillips's desire to stop its circulation influenced Kelly or Zomoida's probable cause determination or decision to prosecute, nor that they pursued the charge for any reason other than to convict Rodrigues for receiving stolen property. Summary judgment is thus proper on this claim.

###### vi.    *Supervisor Liability (Count 10)*

In this claim against the City of Campbell, Rodrigues avers that, "[a]s a direct and proximate result of [d]efendant's . . . actions made in bad faith relative to the hiring, training, supervision, retention and/or discipline of [the individual] [d]efendants, Mr. Rodrigues suffered a violation of his rights, damages, and other losses." (Doc. No. 1-1 ¶ 70.) But an independent review of the record does not reveal anything about the City of Campbell's hiring, training, supervision retention and/or discipline of the individual defendants—much less that the city was negligent or malicious in these practices. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."). Defendants are entitled to summary judgment on this claim.

###### vii.    *Violation of Ohio Public Records Law (Count 11)*

Rodrigues also claims that the defendants violated state public records law. (Doc. No. 1-1 ¶¶ 71–74.) To state a *prima facie* claim under Ohio Rev. Code § 149.351, (1) Rodrigues must have requested public records; (2) the public office must have been obligated to honor that request; (3) the office must have disposed of the public records in violation of Ohio Rev. Code § 149.351(A); and (4) Rodrigues must be aggrieved by the improper disposal. *Rhodes v. New Philadelphia*, 951 N.E.2d 782, 786 (Ohio 2011). As defendants point out (Doc. No. 24, at 38), because Rodrigues does not allege, and the record does not reflect, that he ever made a public records request to the City of Campbell, this claim fails as a matter of law and summary judgment is proper.

###### viii.    *Other Claims against the City of Campbell*

Rodrigues's false arrest (Counts 1 and 2) and First Amendment retaliation (Count 9) claims are directed at "defendants[,]" which the Court construes to include the City of Campbell. (Doc.

No. 1-1 ¶¶ 28, 32, 64.) Even if Rodrigues could show some constitutional violation (which he cannot), summary judgment is proper on those claims against the City of Campbell, because "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691.

### ix.  Defamation (Count 12)

In his final claim, Rodrigues avers that all defendants defamed him by "publish[ing] false statements of fact to the media and other third parties . . . [which] caused him harm." (Doc. No. 1-1 ¶ 76.) Rodrigues testified he is unaware of any statement published by any defendant that was potentially defamatory. (Doc. No. 25-2, at 13 (50:24–52:20).) Further, as defendants note (Doc. No. 24, at 37–38), the record is devoid of any statements of fact made to the media—much less false statements. Because Rodrigues cannot satisfy the elements of a defamation claim, summary judgment is proper. *See Sygula v. Regency Hosp. of Cleveland E.*, 64 N.E.3d 458, 466 (Ohio Ct. App. 2016) ("To prevail on a defamation claim, a plaintiff must prove five elements: 1) a false statement; 2) about the plaintiff; 3) published to a third party; 4) with the required degree of fault by the defendant publisher; and 5) defamatory per se or defamatory per quod, causing special harm to the plaintiff." (citation and quotation marks omitted)).

### E. Claims Against the John Doe Defendants

While this case has been litigated exclusively between Rodrigues and the four named defendants, Rodrigues's complaint also lists John Doe law enforcement officers 1–6[16] as parties. (Doc. No. 1-1, at 1.) Rodrigues describes the Does collectively as "relevant police, corrections officers or other government officials employed by, or acting on behalf of the City of Campbell and were acting under color of law and in the course and scope and in furtherance of their

---

[16] Rodrigues also refers to "John Does Officers 1-7" in his complaint. (*See, e.g.*, Doc. No. 1-1 ¶¶ 48, 52, 67.) If there is a seventh Doe, the same analysis applies, and John Doe 7 is dismissed.

employment with the City of Campbell[,]" and specifically describes John Doe 1 as " Rodrigues' arresting officer whose identity is known to the Defendants and/or the Defendants are in possession of John Doe 1's identity." (Doc. No. 1-1 ¶ 6.) Discovery in this case is now complete, but Rodrigues has still not identified or served any of the Doe defendants. (Doc. No. 13 (Second Amended Case Management Plan and Trial Order), at 1.)

In general, the use of unnamed defendants is not favored in the federal courts." *Haddad v. Fromson*, 154 F. Supp. 2d 1085, 1093 (W.D. Mich. 2001) (citation omitted), *overruled on other grounds by Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002). Simply naming a person, using a fictitious title, in a lawsuit does not make that person a party and does not prevent the entry of a final judgment. *Id*. Since filing this action over a year ago, Rodrigues has had adequate opportunity to identify the Does but has failed to do so. Thus, the unnamed defendants are dismissed without prejudice.

## IV.    CONCLUSION

For the reasons set forth herein, defendants' motion for summary judgment (Doc. No. 24) is granted and this case is dismissed.

**IT IS SO ORDERED**.

Dated: July 11, 2025

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**